Filed 8/10/26  P. v. Rhodes CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>v.<br><br>JOE THOMAS RHODES,<br>        Defendant and Appellant. | C102607<br><br>(Super. Ct. No. 19FE014513) |

Defendant Joe Thomas Rhodes, an Oak Park Bloods gang member, was driving a vehicle when his passenger, codefendant Nicholas Hayes-Kelly, also an Oak Park Bloods member (who is not a party to this appeal), fired a semiautomatic firearm at rival gang members in another car stopped at a traffic light.  Two of the three occupants of the targeted car were struck by gunfire.  A jury found defendant guilty of discharging a firearm at an occupied motor vehicle, attempted murder, and three counts of assault with a semiautomatic firearm.  The trial court sentenced defendant to seven years to life plus a determinate term of nine years in state prison.

On appeal, defendant argues that (1) the trial court prejudicially abused its discretion in admitting clips from two gang-related rap music videos over his Evidence Code section 352.2 objection,  and (2) the abstract of judgment must be corrected to

1

reflect that, in orally pronouncing judgment, the trial court stayed execution of the determinate term imposed on count three pursuant to Penal Code section 654.[1]

We will affirm the judgment and order the abstract corrected as specified below.

## BACKGROUND

A second amended information charged defendant and Hayes-Kelly with discharging a firearm at an occupied motor vehicle (§ 246; count one), attempted murder (§§ 664, 187, subd. (a); count two), and assault with a semiautomatic firearm (§ 245, subd. (b); counts three-five). The information alleged defendants inflicted great bodily injury (see § 12022.7), and, as to each count, asserted criminal street gang enhancement allegations (§ 186.22, subd. (b)(1)). Counts and allegations pertaining only to Hayes-Kelly are not included here.

## I

*Trial Evidence*

A. *The August 10, 2019, Shooting*

A.J.[2] testified under subpoena. In August 2019, he was driving a car accompanied by his cousin, K.K., and a female friend, S.G., when he was shot. S.G. was not hit by gunfire. A.J. could not recall what happened because he was under the influence of alcohol and drugs that day. Sacramento Sheriff's Detective Alex Zakrzewski spoke with A.J. at the hospital. In the interview, which was played at trial, A.J. told Detective Zakrzewski he was a Starz gang member. At trial, A.J. denied being a Starz member.

---

[1]     Further undesignated section references are to the Penal Code.

[2]     To protect their privacy, we will refer to the victims and witnesses by their initials. (Cal. Rules of Court, rule 8.90(b)(4), (10) & (11).)

K.K., who also was hit by gunfire, likewise testified under subpoena. K.K. did not recall getting shot, and did not see who shot him. He had been in a car with A.J. and a female at the time. K.K. testified he was not in a gang. T.P. testified that, on August 10, 2019, she was with her sister in a Prius in the left turn lane at 65th Street and Stockton Boulevard in Sacramento when the passenger side of her vehicle was struck by gunfire.

B.      *Surveillance Video of Events Prior to and Including the Shooting*

K.K. told Detective Steven Abelia that, just before the shooting, he had left a liquor store at 47th Avenue and Stockton Boulevard. Deputy Brandon Feldman obtained surveillance video from the Pints-N-Fifths liquor store, which was played at trial. Detective Zakrzewski described what appeared on the video. A black Pontiac pulled in and parked, defendant got out of the driver's seat, retrieved a child from the backseat, and walked out of the frame. Another individual exited the rear passenger side of the car and looked around the parking lot. Detective Zakrzewski testified that this individual was similar in stature and appearance to Hayes-Kelly, including his beard. Defendant returned to the vehicle and got in. An arm could be seen extending out the front passenger window of the Pontiac, indicating there was a third person in the car.

At some point, A.J. and K.K.'s vehicle pulled into the liquor store and parked; A.J. exited the vehicle. The driver's window of the Pontiac then closed. Later, A.J. got back into the driver's seat of his car and drove off, turning right out of the parking lot. The Pontiac then did "somewhat of a U-turn in the parking lot" and left the parking lot from the same exit as A.J.'s car.

Detective Zakrzewski also described what he observed on gas station and Department of Transportation surveillance videos recorded at the intersection of Stockton Boulevard and 65th Street. A.J. and K.K.'s white vehicle and T.P.'s Prius were stopped at the intersection. The gas station surveillance video showed the Prius in a turn lane and A.J.'s car on the right side of the Prius. The black Pontiac then pulled up on the passenger side of A.J.'s vehicle. The video showed an object emerging from the

3

Pontiac's driver's-side rear window, and then smoke consistent with muzzle smoke coming from that window. This occurred at 12:57 p.m.

C.      *Cell Phone Location Evidence*

Daniel Garbutt testified as an expert in call detail records, geolocation analysis, and forensic cell phone analysis. He testified that call detail records indicated that cell phones associated with defendant and Hayes-Kelly were connected to a cell tower near the Pints-N-Fifths liquor store at some time between 12:41 and 12:46 p.m. on August 10, 2019.

D.      *Defendant's Acquaintances and the Pontiac*

K.H., testifying under subpoena, shared a son with defendant. On August 10, 2019, defendant delivered their son to her at the Pints-N-Fifths liquor store. Before the exchange, defendant told K.H. on the cell phone that he was with Nick and Drai.

On August 11, 2019, Sergeant Kenny Shelton went to an address associated with defendant where he observed the Pontiac. J.W., who shared children with defendant, told Sergeant Shelton she owned the Pontiac, but acknowledged that defendant sometimes drove it.

E.      *Yuba County and Recovery of the Firearm*

S.D., who testified under subpoena, had children with Hayes-Kelly. The prosecution played a 911 call placed by her brother, E.H. on August 18, 2019, received in Yuba County. In the call, E.H. reported that S.D. and Hayes-Kelly were fighting, and that Hayes-Kelly had a black nine-millimeter gun pointed at S.D.

Detective Tyler Johannes of the Yuba County Sheriff's Department responded to the 911 call. When he arrived, a group of five or six people approached his location. One, B.H., was carrying a backpack. Detective Johannes searched the backpack and found a Springfield nine-millimeter firearm. Deputy Jeff Murphy asked S.D. about the firearm, and she told Detective Murphy the gun was Hayes-Kelly's.

4

F.     *Forensic Firearms Analysis*

After the shooting, Deputy Feldman found 10 spent nine-millimeter cartridge casings and a fired bullet in the intersection.  Detective Zakrzewski obtained the firearm recovered in Yuba County and submitted it for analysis.  Jeremy Zerbe, a criminalist, testified as an expert in forensic firearm analysis.  Zerbe analyzed the Springfield nine-millimeter firearm and the 10 cartridge casings.  He determined that all 10 cartridge casings had sufficient agreement of individual features for him to conclude that they were all fired by the same firearm.  Zerbe test-fired the Springfield and compared the cartridge casings from the test fires with one of the cartridge casings recovered in this case.  He concluded that the cartridge casing recovered in this case was fired from the same firearm as the three test fires and, because he had already concluded that all 10 recovered cartridge casings were fired from the same firearm, he further concluded that all 10 cartridge casings were fired by the Springfield.

G.     *Gang Evidence*

Detective Terrence McDonald testified as an expert in criminal street gangs.  He testified that defendant and Hayes-Kelly were both Oak Park Bloods gang members.  They both had gang-related tattoos.  Defendant had a "P" tattoo representing Oak Park.  Both had been observed in the presence of other gang members.  Both posted photos to social media in which they were with other Oak Park Bloods members and were throwing up gang signs related to the Oak Park Bloods.

Detective McDonald testified that the primary rivals of the Oak Park Bloods were the Stickup Starz.  The two gangs engaged in shootings and fights with each other.  They also made videos disrespecting each other.  In August 2019, matters between the two gangs were bad.  Detective McDonald described one social media interaction in which K.H., who shared a son with defendant, posted about a particular individual, and then asked defendant why he had an issue with her post.  Defendant's account responded, "That's a mutha fuckin' Star.  Fuck you mean?"  According to Detective McDonald, it

5

was clear defendant was upset that K.H. posted about a Starz member "because she should know that that's his rival because he's from Oak Park."

Detective McDonald testified that A.J. and K.K. were members of Stickup Starz in August 2019. He also testified that he had seen gang rap videos posted to YouTube in which A.J. and K.K. appeared. The prosecution played portions of a recorded telephone conversation between the prosecutor and A.J. In the call, A.J. indicated he did not want to testify, stating that he was "a gang member from one side and they're gang members from the other side." A.J. told the prosecutor he was not an average citizen, but rather was a "fuckin' high-rankin' gang member…."

Regarding the surveillance video from the Pints-N-Fifths liquor store, Detective McDonald testified that, if the occupants of the Pontiac were Oak Park Bloods members, they would have had a motive to kill A.J. because he was a known Starz member and he could be seen in videos disrespecting Oak Park Bloods members. He also testified that, when A.J. got out of his car in the liquor store parking lot, defendant deliberately closed the driver's window of the Pontiac to avoid being seen because "he recognized the person that was there, and he didn't want them to see him" because "it can lead to a shootout, a fight or an altercation."

## II

### *Verdict and Sentencing*

The jury found defendant guilty of all counts charged against him. The jury found true allegations in counts one, two, three, and five, that the crimes involved great bodily injury, and the allegation in count two that defendant aided and abetted attempted murder willfully, deliberately, and with premeditation. Following a bifurcated trial, the jury found not true all gang enhancement allegations asserted against defendant (and therefore we have not summarized that evidence here), but found true three sentencing circumstances in aggravation. (Cal. Rules of Court, rule 4.421(b)(2), (4), (5).)

6

The trial court sentenced defendant to an indeterminate term of seven years to life on count two, determinate upper terms of nine years on counts three, four, and five, and a determinate upper term of seven years on count one. The court ordered counts one, three, and five to run concurrently with count four, and stated that the sentence imposed on count three was stayed pursuant to section 654.

DISCUSSION

I

*Evidence Code Section 352.2 and the Admission of Two Gang Rap Videos*

A.    *Additional Background and Defendant's Contentions*

Over defendant's objections in motions in limine, the trial court granted the prosecutor's request to admit two YouTube videos at trial, one entitled "Ima S.T.A.R.," and the other entitled "Tha Truth." A.J. and K.K. appeared in the "Ima S.T.A.R." video, displaying Stickup Starz gang signs and demonstrating their connection to that gang. The prosecution stated that this video demonstrated that both victims would be targeted by the rival Oak Park Bloods because of "their overt representation of their gang and disrespect of the Oak Park Bloods." "Tha Truth" was a video by an influential Oak Park Bloods member, in which he disparaged Stickup Starz members, including A.J. specifically. According to the prosecutor, that an influential member of the Oak Park Bloods would "call[] out" A.J. in his video demonstrated that A.J. was a target for Oak Park Bloods gang members. Neither video featured defendant or codefendant Hayes-Kelly. Additionally, "Tha Truth" predated the shooting here by perhaps 10 years, and "Ima S.T.A.R." was made approximately seven years before the shooting. The trial court allowed the prosecutor to play 45 seconds of "Ima S.T.A.R." and one minute 10 seconds of "Tha Truth" at trial.

7

Defendant argues that the videos were inadmissible under Evidence Code section 352.2, and that their admission constituted reversible error. Even assuming for argument's sake that the trial court erred in admitting the videos, we conclude that any error did not prejudice defendant.

B.  *Standard of Review*

Where no due process violation has occurred—defendant does not claim his trial was fundamentally unfair or that a due process violation occurred here—we assess prejudice resulting from the improper admission of evidence following an exercise of discretion under the standard in *People v. Watson* (1956) 46 Cal.2d 818. (See *People v. Coneal* (2019) 41 Cal.App.5th 951, 972; see also *People v. Marks* (2003) 31 Cal.4th 197, 226-227 [application of ordinary rules of evidence like Evidence Code § 352 does not implicate the federal Constitution and review is under *Watson*].) Under *Watson*, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *Watson*, at p. 836.)

C.  *Prejudice*

A core component of defendant's argument addressed to prejudice is that "he was unaware of [Hayes-Kelly's] intent until the shooting started." However, defendant's position is severely undermined by the trial evidence.

Detective McDonald testified at the trial on the substantive counts that defendant and Hayes-Kelly were both Oak Park Bloods gang members. Defendant and Hayes-Kelly both had gang-related tattoos. Defendant had a "P" tattoo representing Oak Park. Both had been observed in the presence of gang members. Both posted photos to social media in which they were with other Oak Park Bloods members and in which they were throwing up gang signs associated with the Oak Park Bloods.

Detective McDonald testified that the primary rivals of the Oak Park Bloods were the Stickup Starz. The two gangs engaged in shootings and fights with each other. In

8

August 2019, matters between the two gangs were bad. Defendant chastised K.H. for a social media post involving a Starz member, stating, "That's a mutha fuckin' Star. Fuck you mean," indicating, according to Detective McDonald, that he was upset K.H. posted about a Starz member "because she should know that that's his rival because he's from Oak Park."

Although both denied it at trial, Detective McDonald testified that both A.J. and K.K. were well-known and respected members of Stickup Starz in August 2019. A.J. told Detective Zakrzewski that he was a known Starz gang member. In a phone call with the prosecutor, A.J. said he was "a gang member from one side and they're gang members from the other side."

On August 10, 2019, the black Pontiac driven by defendant could be seen in surveillance video pulling into the Pints-N-Fifths liquor store on Stockton Boulevard. Around this time, between 12:40 and 12:46 p.m., call detail records indicated that cell phones associated with defendant and Hayes-Kelly were in the area of the Pints-N-Fifths liquor store. After the Pontiac parked, defendant got out of the driver's seat, retrieved a child from the backseat, and walked out of the frame. K.H. testified that, that day, defendant delivered their son to her at the Pints-N-Fifths liquor store. Before defendant's arrival at that location, he had told K.H. that he was with "Nick" and "Drai." Hayes-Kelly's first name is Nicholas, and the surveillance video established that there was a third person in the Pontiac. Additionally, an individual who looked like Hayes-Kelly got out of the Pontiac and looked around. Thus, the evidence was strong that defendant and Hayes-Kelly were in the black Pontiac at the Pints-N-Fifths liquor store minutes before the shooting. In fact, defendant expressly states on appeal that he does not raise any issue with respect to identity.

A.J. and K.K.'s vehicle then pulled into Pints-N-Fifths. After A.J. exited his vehicle, the Pontiac's driver's window closed. Detective McDonald testified that defendant, recognizing A.J., deliberately closed the window to avoid being seen by A.J.

9

which could "lead to a shootout, a fight or an altercation." Later, A.J. drove off, turning right out of the parking lot. Defendant, driving the black Pontiac, did "somewhat of a U-turn" and followed A.J.'s car out of the parking lot, suggesting he deliberately followed A.J.'s car.

Shortly thereafter, the black Pontiac driven by defendant could be seen pulling up next to A.J.'s vehicle at 65th Street and Stockton Boulevard. An object extended out of the driver's side rear window, and then muzzle smoke appeared. A.J. and K.K. both were shot. Detective McDonald testified that if the occupants of the black Pontiac were Oak Park Bloods members, they would have had a motive to kill A.J., a known Starz member who could be seen in videos disrespecting Oak Park Bloods.

Law enforcement found 10 nine-millimeter cartridge casings in the intersection where the shooting occurred. Criminalist Zerbe concluded that those cartridge casings were all fired by Hayes-Kelly's Springfield nine-millimeter firearm.

The foregoing constitutes strong evidence that defendant and Hayes-Kelly identified and deliberately followed, targeted, and fired on A.J. and his associates. This evidence belies defendant's claim that he was oblivious to Hayes-Kelly's intentions until the shooting started.

Against this background, the video evidence was brief, totaling less than two minutes. The videos were cumulative of other evidence, and thus the facts proved by the videos were proved by other, less prejudicial evidence.

In addition, the trial court instructed the jurors that they "may consider evidence of gang activity only for the limited purpose of determining whether: [¶] One: The defendants had a motive to commit the crimes charged. [¶] Or two: The defendants intended to kill [A.J.]. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendants are persons of bad character or that they have a disposition to commit crime." (CALCRIM No. 1403.) To the extent the videos could have "inject[ed] racial bias into the proceedings" (Evid. Code,

10

§ 352.2, subd. (a)(2)), and contained misogynistic and homophobic content, the trial court also instructed the jurors that they were not to "let bias, sympathy, prejudice or public opinion influence" their decision, and that "bias" included bias based on gender, race, ethnicity, and sexual orientation. (CALCRIM No. 200.) "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

We conclude that it is not reasonably probable that the defendant would have obtained a more favorable result absent any error in admitting the two videos.

II

*Abstract of Judgment*

Defendant argues that the abstract of judgment must be corrected to reflect that, in orally pronouncing sentence, the trial court stayed execution of the sentence imposed on count three pursuant to section 654. We agree.

Section 654 provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) In orally pronouncing judgment, the trial court ordered execution of the sentence imposed on count three stayed under section 654. The abstract of judgment, however, does not reflect this pronouncement. "The oral pronouncement of judgment controls over any discrepancy with the minutes or the abstract of judgment." (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864.)

The People argue that section 654 does not forbid multiple punishments for violent crimes involving multiple victims, and the trial court could not stay the sentence imposed on count three under section 654. "There is a multiple victim exception to … section 654 which allows separate punishment for each crime of violence against a different victim,

11

even though all crimes are part of an indivisible course of conduct with a single principal objective." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1630-1631.)

Here, the probation report recommended that a nine-year determinate term be imposed on count three and execution of that sentence be stayed under section 654 as it was "an alternative statement to Count 2." At sentencing, the prosecutor recommended that the sentence imposed on count three be stayed pursuant to section 654 as "an alternate to Count 1…." The People did not raise in the trial court their argument that the court could not stay execution of the sentence on count three based on the multiple victim exception.

In any event, whether section 654 applies is a factual question, and we review the trial court's decision for substantial evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "In analyzing whether section 654 bars the imposition of multiple sentences, we consider the evidence in the light most favorable to the judgment and affirm the trial court's sentencing decision—whether express or implied—if it is supported by substantial evidence. [Citations.] Under this standard, this court must view the evidence in the light most favorable to the trial court's finding and presume the existence of every fact the trial court could reasonably deduce from the record." (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737.)

Defendant was charged in count two with the attempted murder of A.J., and the jury found defendant guilty of the attempted murder of A.J. on count two. Defendant was charged in count three with assault with a semiautomatic firearm on A.J., and the jury found defendant guilty of assault with a semiautomatic firearm on A.J. on count three. The sentence on count three, assault with a semiautomatic firearm on A.J., was properly stayed pursuant to section 654 because count three arose from the same course of conduct and was motivated by the same single criminal objective as the attempted murder of A.J., for which he was convicted and sentenced in count two. (See *People v. Felix, supra*, 172 Cal.App.4th at p. 1631 [ordering abstract corrected to reflect that execution of

sentence for assault with a firearm on a specified victim was stayed pursuant to § 654 where the defendant was also sentenced for attempted murder of the same victim].)

Defendant was also found guilty by the jury and sentenced on separate counts of assault with a semiautomatic firearm on S.G. (count four), and K.K. (count five). Neither S.G. nor K.K. could properly be a "multiple" victim on count three, as defendant was separately punished for assault with a semiautomatic firearm as to each of them.

The People look beyond the three victims in A.J.'s car, emphasizing that T.P. and her sister were in a Prius next to A.J.'s vehicle, and claim that any "of these five people could have easily been injured." Because the trial court stayed execution of the sentence imposed on count three, we presume that the court implicitly found the multiple victim exception to section 654 inapplicable. (See generally *People v. Ramirez* (2021) 10 Cal.5th 983, 1042 ["Absent evidence to the contrary, we presume that the trial court knew the law and followed it"].) Although the passenger side of the Prius was struck by gunfire, T.P. and her sister were not. Viewing the evidence in the light most favorable to the trial court's findings and presuming the existence of every fact the trial court could reasonably deduce from the record, we conclude that the court properly could have found that T.P. and her sister, who were neither identified as victims in the information nor injured in the shooting, were not victims of defendant's assault with a semiautomatic firearm charged in count three. The court's implicit finding is supported by substantial evidence. We will order the abstract corrected to reflect that the execution of the sentence imposed on count three is stayed.

The People also argue that the abstract must be corrected to designate count four, rather than count three, as the principal determinate term. We agree. The trial court imposed count four as the principal determinate term, as it ordered the other determinate terms to run concurrently. However, the abstract indicates count three is the principal term. We will order the abstract corrected to reflect that count four is the principal determinate term.

13

## DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment reflecting that (1) execution of the nine-year determinate term imposed on count three is stayed pursuant to section 654, and (2) count four is the principal determinate term, and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


\s\
KRAUSE, J.

We concur:


\s\
EARL, P. J.


\s\
HULL, J.